## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| HARRIET PAYNE, CHARLES PAYNE, JR., CAVIN PAYNE, STEPHANIE PAYNE, BETTY MORRISON, KIZZ GOINS, KATANIA DEARBORNE, AND ROBERT PAYNE, | § § § § § § § | |
| *Plaintiffs,* | § § | |
| v. | § § § | CIVIL ACTION NO: Jury Requested |
| CITY OF HOUSTON, TEXAS; and CHRISTOPHER CABRERA, | § § § § | |
| *Defendants.* | § | |

### PLAINTIFFS' ORIGINAL COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Plaintiffs, HARRIET PAYNE, CHARLES PAYNE, JR., CAVIN PAYNE, STEPHANIE PAYNE, BETTY MORRISON, KIZZ GOINS, KATANIA DEARBORNE and ROBERT PAYNE, complaining of Defendant, the City of Houston, and Defendant Christopher Cabrera, and in support of this Original Complaint, Plaintiffs respectfully show the following.

### I.    SUMMARY OF THE COMPLAINT

1.      Charles Payne, Sr. was taking a normal drive on a Sunday afternoon after leaving church. Unbeknownst to him, his life would be taken from him by a Houston Police Officer who was going over double the speed limit on a road that the City of Houston had already identified as being extremely dangerous. This Officer was acting in accordance with the City's deliberately indifferent and inadequate training policies and with the City's driving policies that permitted and

ORIGINAL COMPLAINT                                                                                    1

encouraged reckless driving by their officers with deliberate indifference to the known and obvious dangers those policies and actions would have on the lives and constitutional rights of the citizens of this great city.

2.      Officer Christopher Cabrera was acting under color of state law when he was heading from the Joint Processing Center ("JPC") back to his station to fill out a report. It is undisputed that Officer Cabrera was not responding to an emergency, was not engaged in a pursuit, was not responding to a 9-1-1 call, and had no legitimate reason for needing to disregard traffic laws. Filling out a report should not take precedence over the lives and safety of the citizens that police officers are sworn to protect.

3.      Instead, in complete disregard for the safety and well being of those around him, Officer Cabrera for over an hour between the time of leaving the JPC to the time of the collision routinely exceeded the speed limit by double digits. Officer Cabrera admittedly did not have his lights or sirens on at any time during this trip.

4.      Officer Cabrera then began to drive northbound on N. Shepherd Dr. This road had numerous fatal collisions due to its design including two in 2020 and has been identified by the City as early as 2020 as an extremely dangerous road. N. Shepherd Dr. is a six lane road that has numerous stores and residential driveways and crossings intersecting throughout the road. Vehicles and pedestrians are crossing the road at all points and times of day. Because of the danger of this road, the speed limit is 35 mph.

5.      Officer Cabrera, despite knowing of this danger and the speed limit, accelerated to 70 mph doubling the speed limit. Mr. Payne was driving southbound on N. Shepherd Dr. going at or under the speed limit when he pulled into the left hand turn lane to make a turn onto Thornton Rd. As Mr. Payne was pulling slowly up to the intersection, another vehicle was in the turn lane

ahead of him from the opposite direction. Officer Cabrera admits that he could not see Mr. Payne and that Mr. Payne could not see him. Yet, the evidence shows that Mr. Payne could see well ahead and would have seen anyone going the speed limit that would have interfered with his turn. Because Mr. Payne saw that the lanes appeared clear, Mr. Payne navigated the turn in a reasonable and safe manner. Unfortunately, because Officer Cabrera was going double the speed limit, Officer Cabrera's vehicle made it to the intersection in half of the time and t-boned Mr. Payne's vehicle.

6.      Mr. Payne suffered for several minutes after being pulled out of the vehicle while Officer Cabrera suffered no apparent injuries other than a measly scratch. Eventually, Mr. Payne passed away due to the blunt force trauma he received from the collision. Had Officer Cabrera simply followed the law and gone the speed limit, the collision would have never occurred.

7.      Officer Cabrera's actions shock the conscious as he had no legitimate purpose for driving 70 mph in a 35-mph zone without lights or sirens on. Instead, these actions were simply for his own purpose and violated Mr. Payne's clearly established constitutional rights under the Fourteenth Amendment.

8.      Ultimately, the City is liable for the violation of Mr. Payne's constitutional rights and for the damages suffered by Plaintiff under two *Monell* § 1983 causes of action. The City and its policymakers knew or should have known of the numerous fatal collisions caused by officers who were disregarding safe driving habits and who were acting with reckless disregard for the lives of those around them. Specifically, the City by and through their policymakers including Chief of Police Troy Finner promulgated numerous policies, practices, and customs which were the moving force in the violation of Mr. Payne's constitutional rights. These policies include a policy permitting and encouraging reckless driving by officers without any regard for the safety of those around them, a two-hour charge policy which requires officers to speed to meet this arbitrary

ORIGINAL COMPLAINT                                                                                    3

goal which serves no legitimate government purpose, a lack of discipline and supervision of officers as officers are never pulled over or held accountable in any way for their unsafe driving habits, and for a policy permitting drivers to disregard traffic laws when simply assigned to a call despite the absence of any emergency.

9.      Additionally, the City is liable for its inadequate and deliberately indifferent training policies. The City is aware that officers who are not trained on proper driving techniques including enforcing when they are not to speed or disregard traffic laws will disregard those laws and use their untouchable freedom as officers to speed at will which leads to numerous fatal collisions. Officer Cabrera was a product of this inadequate and deliberately indifferent policy which led him to believe that he was permitted to drive at double the speed limit even when just driving to his station to fill out a report. Because of this training policy, Mr. Payne's life was taken away from him.

10.     The video evidence paints a clear picture of the consequences of the City's policies and training. Plaintiffs individually and as the heirs of Mr. Payne seek justice for the life that was taken from them and seek to be made whole for this gross violation of Mr. Payne's constitutional rights.

## II.    **PARTIES**

11.     Plaintiff HARRIET PAYNE is an individual who currently resides in Houston, Harris County, Texas. She is the spouse of Charles Payne, Sr. The last three digits of Plaintiff's social security number and driver's license number are 134 and 050, respectively.

12.     Plaintiff CHARLES PAYNE, JR. is an individual who currently resides in Houston, Harris County, Texas. CHARLES PAYNE, JR. is the child of Charles Payne, Sr. The last three digits of Plaintiff's Social Security Number and Driver's License Number are 760 and 577,

respectively.

13.     Plaintiff CAVIN PAYNE is an individual who currently resides in Houston, Harris County, Texas. CAVIN PAYNE is the child of Charles Payne, Sr. The last three digits of Plaintiff's Social Security Number and Driver's License Number are 378 and 653, respectively.

14.     Plaintiff STEPHANIE PAYNE, is an individual who currently resides in Houston, Harris County, Texas. She is the child of Charles Payne, Sr. The last three digits of Plaintiff's Social Security Number and Driver's License Number are 298 and 803, respectively.

15.     Plaintiff BETTY MORRISON is an individual who currently resides in Houston, Harris County, Texas. She is the child of Charles Payne, Sr. The last three digits of Plaintiff's Social Security Number and Driver's License Number are 291 and 379, respectively.

16.     Plaintiff KIZZ GOINS is an individual who currently resides in Houston, Harris County, Texas. She is the child of Charles Payne, Sr. The last three digits of Plaintiff's Social Security Number and Driver's License Number are 298 and 906, respectively.

17.     Plaintiff KATANIA DEARBORNE is an individual who currently resides in Houston, Harris County, Texas. She is the child of Charles Payne, Sr. The last three digits of Plaintiff's Social Security Number and Driver's License Number are 755 and 333, respectively.

18.     Plaintiff ROBERT PAYNE is an individual who currently resides in Houston, Harris County, Texas. He is the child of Charles Payne, Sr. The last three digits of Plaintiff's Social Security Number and Texas Identification Number are 276 and 317, respectively.

19.     Defendant CITY OF HOUSTON (the "City") is a political subdivision organized according to the laws of the State of Texas and may be served with process by serving Pat J. Daniel, City Secretary, Office of the City Secretary City Hall Annex 901 Bagby, Room P101, Houston,

Texas 77002. The City is the political subdivision in charge of the Houston Police Department and is located within the Southern District of Texas, Houston Division.

20.     Defendant Christopher Cabrera ("Officer Cabrera") is an individual that resides in the Southern District of Texas Houston Division and may be served with process at his residence at 14700 Woodson Park Dr. 216, Houston, Texas 77044. Both now and at the time of the collision, Officer Cabrera works for the City as a police officer within the Houston Police Department ("HPD"). Officer Cabrera is being sued individually. At all relevant times , Officer Cabrera was acting under color of state law in carrying out the conduct described in detail throughout the Complaint.

### III.     JURISDICTION AND VENUE

21.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and § 1343 because Plaintiffs are suing for relief under 42 U.S.C. § 1983 and § 1988.

22.     This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over the alternative Texas Tort Claims Act (TTCA) claim pursuant to TEX. CIV. PRAC. & REM. CODE §101.021, as the TTCA waives Defendant's sovereign immunity for claims involving personal injury, death, or property damage caused by the negligent operation or use of a motor-driven vehicle or motor-driven equipment by Defendant's employee, if that employee would be personally liable to Plaintiffs under Texas law. None of the exceptions to the waiver of sovereign immunity applies as Officer Cabrera was not responding to an emergency situation and was not on a 9-1-1 call as Officer Cabrera was simply driving double the speed limit on his way to his police station to fill out a report. Officer Cabrera was not responding to any emergency, did not have any sirens or emergency lights active, and was obligated to obey all traffic laws; yet, Officer Cabrera deliberately chose to disregard the safety of the public and Mr. Payne by driving over

double the speed limit on a road which is known to be dangerous.

23.     Venue for this action is proper in the Southern District of Texas pursuant to 28 U.S.C. § 1391 because Defendant is located in the Southern District of Texas, and all or a substantial part of the causes of action accrued in the Southern District of Texas.

## IV.    FACTS AND ALLEGATIONS

24.     On December 26, 2021, the day after Christmas, Charles Payne, Sr. was driving southbound on N. Shepherd Dr. obeying all traffic laws and acting as a reasonably prudent driver having just left church. N. Shepherd Dr. is a six lane divided street that has a posted speed limit of 35 mph. This road has numerous driveways and intersections that provide frequent opportunities for vehicles to pull out into the street and attempt to cross the street. Additionally, due to businesses and neighborhoods surrounding the street, many pedestrians are crossing the streets at various times. Because of the significant traffic and opportunities for vehicles to pull into traffic, the speed limit must be followed to prevent collisions.

25.     In 2020, Houston through their Vision Zero plan identified this section of N. Shepherd Dr. as a Priority High Injury Network road as numerous collisions resulting in severe injuries and deaths occurred in this section. This includes two fatalities in 2020. The City and its police officers were well aware that this section of N. Shepherd Dr. required extra caution and abidance with traffic laws including the speed limits. However, as shown below, the City through its policies, practices, and procedures and Officer Cabrera acted with impunity and deliberate indifference to this risk by promoting and encouraging reckless driving including driving double the speed limit by their police officers when those officers were acting in a routine travel to the police station.

26.     While traveling southbound, Mr. Payne signaled to make a lefthand turn onto

ORIGINAL COMPLAINT                                                                    7

Thornton Rd. and slowed down to pull into the left turn lane. Across from Mr. Payne in the northbound turn lane was a large black SUV.

27.     As Mr. Payne approached the intersection (which did not contain a stop sign or traffic light), he could see a significant distance down the road. If someone had been going at or around the speed limit, Mr. Payne would have seen them. Because Mr. Payne did not see any vehicles in any of the lanes of traffic, he began a reasonable turn onto Thornton Rd.

28.     While making the turn, Mr. Payne cleared the first lane and almost cleared the second lane when Officer Cabrera violently crashed into the side of Mr. Payne's vehicle. This caused Mr. Payne's vehicle to slide down the road. Mr. Payne was pulled from his vehicle with numerous injuries and in excruciating pain. Eventually, Mr. Payne became unresponsive and passed away from his injuries caused by the crash.

29.     Leading up to this collision, Officer Cabrera was not responding to any emergency call or situation. Officer Cabrera was not heading to the scene of a crime or heading to any 9-1-1 call. Instead, Officer Cabrera was simply heading back to his station to fill out a report from booking a suspect in the joint processing center in downtown Houston. This report and the policies and practices of the City of Houston were more important than the lives of the City of Houston's citizens because Officer Cabrera acted with complete deliberate indifference to their lives by recognizing the dangers of this section of road along with the dangers that speeding and inattention can have on a driver but chose to go 70 mph in a 35-mph zone anyways.

30.     Officer Cabrera was driving northbound on N. Shepherd Dr. in the far left lane. Officer Cabrera was consistently driving almost double the speed limit within this section of road. While in the left lane going 70 mph and approaching Thornton Rd., Officer Cabrera admits that he looked down at his laptop in his vehicle and by the time he looked up he collided with Mr.

ORIGINAL COMPLAINT                                                                          8

Payne's vehicle. Officer Cabrera admits that he could not see Mr. Payne. The data and testimony shows that Mr. Payne would have seen Officer Cabrera had he been going the speed limit, but because he was not going the speed limit, Mr. Payne could not have seen him. Additionally, if Officer Cabrera had been going the speed limit, he would have missed Mr. Payne's vehicle by a whole 2 seconds which is a significant amount of time on the road.

31.     Officer Cabrera's actions were not a singular event. Instead, Officer Cabrera drove in accordance with Harris County's policies, practices, customs, and procedures which are enacted and enforced with deliberate indifference to Plaintiffs' constitutional rights. In accordance with those policies, practices, and procedures, this collision was inevitable as Houston policies promote and encourage their officers to drive recklessly even during routine driving conditions and not in response to any emergency. This can be seen in numerous ways below.

32.     On the day of the collision, Officer Cabrera drove routinely between 15 mph and 35 mph over the speed limit on 35-mph speed limit roads. At no time during that day was Officer Cabrera responding to an emergency or supposed to disobey traffic laws. At the beginning of the day, Officer Cabrera traveled on Little York Road (another road which has a history of severe collisions as will be shown in some additional incidents below) which is another 35-mph divided road. While on this road, Officer Cabrera traveled consistently between 60 and 66 mph. While on Airline Rd. which also had a 35-mph speed limit, Officer Cabrera drove 61 mph. On Studemont St., he drove 57 mph.

33.     Officer Cabrera in his few trips that day routinely exceeded the speed limit by more than 20 mph. In fact, some of his slower driving was simply 22 mph over the speed limit. For context, several large cities including Dallas, Texas, do not permit their officers to drive more than 20 mph over the speed limit, even during **police pursuits**. Yet, Houston permits their officers to

drive 20 mph or more over the speed limit when they are driving around town without any emergency or need to drive this fast.

34.    This permitted driving behavior is shocking because if a citizen were to drive 60 mph, 65 mph, or 70 mph in a 35-mph zone, the citizen would be cited for reckless driving and would risk losing their license. This makes sense because of the significant danger driving at these speeds has on the roads as there is absolutely no room for error as a collision at those speeds will inevitably lead to severe injuries and potentially death. Yet, Houston allows their officers to drive recklessly whenever they are on the road.

35.    This policy, practice, and procedures are promulgated and promoted by the City's policymakers because Houston Police Officers are never punished, disciplined, or cited for driving over the speed limit. Officer Cabrera testified in a related case that Houston police officers do not pull each other over as a matter of policy and are never warned, reprimanded, or disciplined in any manner for driving over the speed limit or recklessly. Thus, the City's police records do not show any evidence of a police officer being pulled over or disciplined when they drive over the speed limit even if it is double the speed limit.

36.    This utter lack of discipline can be seen in Officer Cabrera's trip that day. The City can monitor the speed of their officers and can determine if they are going over the speed limit at any moment in time. Yet, the City does not use this information to discipline their officers or to provide a means of retraining the officers who consistently exceed speed limits. The City had the capability and knowledge that Officer Cabrera was grossly exceeding the speed limits on multiple 35 mph roads that fall within the City's listing of dangerous and deadly roads. Yet, the City did not contact Officer Cabrera to slow down. As testified to be Officer Cabrera, officers are never told to slow down and they are never pulled over for speeding. Despite the City knowing the

dangers of speeding, the dangers posed by specific roads within the City including N. Shepherd Dr., and their officers' routine reckless driving, the City does nothing. The police roam the streets allegedly enforcing laws, but they are trained and permitted to act with disdain for those laws and the lives of the citizens that they are supposed to protect. This police of lack of discipline and protection plausibly emboldens officers to engage in misconduct including driving at excessive speeds when solely returning to a station to fill out a report.

37.    In addition to the policy permitting this driving behavior and not disciplining or supervising their officers, several policies promulgated by the City require officers to drive with reckless and complete deliberate indifference to the lives of their citizens. First, the City has a written policy which requires officers to file charges within two hours after booking someone in the joint processing center. This policy as shown below was issued on November 22, 2021, by Chief Finner.

**C i r c u l a r**
**Houston Police Department**

☃  November 22, 2021                                      NO.  21-1122-168

SUBJECT:  **REMINDER:  FILING CHARGES UPON BOOKING PRISONERS AT THE**
**JOINT PROCESSING CENTER**

In an effort to ensure prisoners are handled in a timely manner and in accordance with state law,
all employees are reminded that after booking a prisoner into the Joint Processing Center (JPC),
charges are to be filed within two (2) hours.  Upon filing charges, officers are to contact the JPC
sergeant at 346-286-1200 to have them reviewed.  Officers are also reminded that they are
responsible for the content of the charges and must make any required changes until the Assistant
District Attorney's (ADA) office has accepted them.

If a Houston Police Department (HPD) JPCU supervisor determines that the charges require
additional information or revisions, then the HPD JPCU supervisor shall contact the officer that
submitted the charges, regardless of their duty status.  The officer shall make the necessary
arrangements to ensure the appropriate revisions are immediately made to the charges.  If off duty,
this can include going to the nearest police station or having a unit come to them when possible to
correct the charges via the MDC.  If the HPD JPCU supervisors are unable to contact the filing
officer directly, their chain of command will be notified and advised of the situation, up to and
including the division commander.

If there are any questions about this process, please contact the JPCU supervisors at the above
number

                                                            Troy Finner
                                                            Chief of Police

tf:mls:blj

Originating Party:
M. L. Skillern, Assistant Chief
Support Services Command

COP #21-80408                              **STATE OF TEXAS**
                                          **COUNTY OF HARRIS**

            **TO BE READ at ALL ROLL CALLS FOR 5 DAYS**   I, Troy Finner, Chief of Police, Houston, Texas
                                                          certify that the foregoing is a true and
                                                          correct copy of the original record, now in
                                                          the lawful custody and possession of the
                                                          Houston Police Department.

                                                          Witness my official hand and seal of office, this
                                                          November 29, 2023 .
                                                          By Ashanti Thomas     Deputy

38.     Officer Cabrera alleges that he was heading to the station in accordance with that

policy which required him to speed to get to the station on time to meet that policy. No law in the

state of Texas requires a charge to be filed within two hours of a person being booked into jail.

This policy serves no legitimate government purpose because filing a charge within a few hours

versus a few days makes no bit of difference in the charges against the detainee. Instead, Officer

Cabrera testified that due to the size of the City and the location of his station it could take him

almost an hour to get back to his station to file a charge which required him to hurry back. When

enacting this policy, the City was well aware that their officers routinely drove excessively over

ORIGINAL COMPLAINT                                                                        12

the speed limit when driving around town and not in response to an ongoing emergency, the City was aware of the time of travel between the joint processing center and the officers' stations, the City was aware of the size of the City, the City was aware of the speed limits of the roads, the City was aware that officers would be traveling on roads which the City determined were dangerous and deadly, and the City was aware that speeding 20 plus mph over the speed limit on these roads posed a substantial risk of severe or life-threatening injuries to those hit by these officers. Yet, the City still enacted this policy with deliberate indifference to the lives and constitutional rights of their citizens which ultimately led to Mr. Payne's death.

39.    Second, the City also has a policy that permits their officers to drive recklessly and deliberately indifferent to the lives and constitutional rights of their citizens by allowing officers to drive in complete disregard for the traffic laws when the officer is simply assigned to a call and not actually responding to a call. Officer Cabrera in this case testified that at the time of the collision he was still assigned to a call which meant that he could drive at this speed and did not need to obey the traffic laws. Yet, he did testify that at the time of the collision no emergency existed, the detainee had already been arrested and booked into the jail, and that he was simply returning to his station to fill out a report. This undisputed evidence shows that Officer Cabrera was not actually responding to an emergency or a situation which required immediate police intervention. Reports should not be placed at a higher priority then the lives of the citizens that the officers are supposed to protect. Officer Cabrera was acting in accordance with a City's policy which permits officers to drive with disregard to the traffic laws simply when they are on a call. This policy is permitted and enforced with deliberate indifference to the lives and constitutional rights of the City's citizens. Mr. Payne was an inevitable victim of this deliberately indifferent policy as the City knew that driving at reckless speeds on known dangerous roads will ultimately

ORIGINAL COMPLAINT                                                                13

lead to collisions with citizen vehicles leading to death and serious injury.

40.    Each of the policies above were promulgated and enforced by the policymaker for the City and Houston Police Department, Police Chief Troy Finner. Chief Finner had direct and constructive knowledge of these policies, practices and procedures being both the person who integrated the policies and who failed to discipline, supervise, and train its officers while also having knowledge of the officers' patterns and practices of reckless driving that places the lives of citizens in danger.

41.    The City is fully aware of the conscious shocking nature of these policies. The City knows of their officers' driving behavior, their actions in light of City policies, and their lack of discipline and supervision in light of numerous incidents even where officers are allegedly responding to actual emergencies. If this behavior and policies are not acceptable when responding to an actual emergency, then it should never be permitted when the officer is simply returning to his station to fill out a report. The incidents identified below are illustrative of the ongoing policies, practices, and procedures of the City that Officer Cabrera was acting in accordance with and the clearly established constitutional rights that Defendants violated.

42.    On April 6, 2020, a Houston police officer was going 60 mph in a 35-mph zone. The police officer was allegedly responding to a call; however, the officer showed no need to exceed traffic laws and ran through an intersection while speeding on this slow road and t-boned a bystander's vehicle that was crossing the intersection. The officer did not have on his emergency sirens. The bystander suffered severe injuries due to this reckless conduct. The bystander filed suit against the City in *Johnson v. City of Houston*, Cause No. 2022-20647 (215th Judicial Dist.). The officer did not receive any significant discipline for his actions. This case exemplifies the City's policy, practice, and procedure of encouraging reckless driving by its officers including going well

over 20-mph over the speed limit on dangerous roads without a legitimate purpose for going over that speed.

43.    On May 12, 2020, an HPD officer while driving on West Little York road was speeding when he collided with a bystander's vehicle crossing an intersection. The collision caused major damage to both vehicles. Although the officer was allegedly in a police chase, the officer was acting with deliberate indifference by recklessly driving over the speed limit and through intersections without taking proper care for the safety of those around him. West Little York road is another road that has a 35-mph limit and is one of the roads that Officer Cabrera drove on earlier on the day of the collision and was driving 66 mph while not responding to any emergency.

44.    On February 22, 2020, an HPD officer was driving at an excessive speed on Telephone Road near Mchenry Street in Houston which is another 35-mph road similar to N. Shepherd Dr. A van proceeding from the opposite direction attempted to make a left hand turn across Telephone Road when it was t-boned by the speeding HPD officer.

45.    On November 21, 2020, HPD Officer Matthew Valdez was responding to call going 90 mph in a 35-mph zone without lights or sirens. Walter Cooper when he was pulling out from a stop-sign was t-boned by Officer Valdez and was killed. Officer Valdez was acting in accordance with policies, practices, and procedures promulgated by the City's policy makers including the chief of police. Officer Valdez was indicted for criminally negligent homicide. Although Officer Valdez was acquitted, the officer's attorney at his trial argued that Officer Valdez's actions were in accordance with the policies, practices, and procedures of the City including an utter failure to train and supervise as Officer Valdez was unclear on how fast to drive when responding to calls or when it was proper to use emergency lights and sirens. This case is another illustration of the pattern, practice, and procedure of the City's policies which led to Mr. Payne's death as Officer

ORIGINAL COMPLAINT                                                    15

Cabrera was also driving over double the speed limit on a 35-mph road without lights and sirens and in accordance with the City's policy to permit officers to drive at reckless speeds in all circumstances.

46.    On November 18, 2020, just before Officer Valdez's collision, two other officers were also involved in collisions with civilian vehicles. In the first collision, an HPD officer collided with a civilian vehicle while going excessive speeds. In the second collision, an HPD officer while speeding and without lights or sirens t-boned a vehicle crossing the street causing the civilian's vehicle to roll over.

47.    On December 4, 2021, an HPD officer was responding to a call going at times 100 mph. When the officer reached 4100 Reed Road, the officer was going 80 mph in a 40-mph zone. At no time did this call require the officer to speed or place civilian lives in danger. Yet, pursuant to Harris County's policies encouraging this reckless driving, the officer continued to drive at this speed. Ultimately, the officer lost control of the vehicle and drove onto a sidewalk hitting a pedestrian, Michael Wayne Jackson. Mr. Jackson was instantly killed. Another officer was in the passenger seat of the vehicle. As seen on the body cam footage, at no time did the other officer ever tell the driver to slow down or to not drive this recklessly which further exemplifies the policy favoring this driving behavior regardless of the risk to civilian's constitutional rights.

48.    Only two days prior to Mr. Payne's death, an HPD officer was speeding on West Little York road (the same one involved in the May 12, 2020, incident and driven on by Officer Cabrera that morning) when he struck the vehicle containing Samuel Salazar in an intersection causing severe injuries. The officer allegedly was chasing another vehicle and was traveling 70 mph in a 35-mph zone and did not reduce his speed before going into an intersection and striking Mr. Salazar. Mr. Salazar filed suit against the City of Houston in *Salazar et al v. City of Houston*,

Cause No. 2022-15403 (11th Judicial Dist.). This incident is a further example of the reckless driving that is promulgated by the policies, practices, and procedures of the City for which the City knew that its training was inadequate but failed to fix that training with deliberate indifference to the lives of its civilians.

49.     Unfortunately, these policies promulgated and enforced by the City police chief continue to wreak havoc on the lives of the City's civilians showing that these policies were in existence and the policymakers were aware of their existence at the time of Mr. Payne's death. For example on December 30, 2022, an HPD officer who was speeding on a freeway without his lights and sirens hit and killed a pedestrian who the officer could have avoided had he been going the speed limit. On January 4, 2023, an HPD officer who was also not responding to an emergency and was speeding without lights or sirens hit a pedestrian, Caleb Swofford, and killed him. Shortly thereafter on January 17, 2023, an HPD officer was also speeding on a service road when he hit and killed a pedestrian trying to cross a road. Each of these are examples of HPD's policy, practice, and procedure of permitting reckless driving and promoting those behaviors through lack of discipline and supervision with conscious disregard for the risks these policies have on the public.

50.     In addition to these similar incident examples, the City's own statistics and Vision Zero action plan demonstrates the City's knowledge of their grossly improper policies, practices, procedures, training, discipline, and supervision and the significant risk these policies have on the constitutional rights and lives of civilians. For example, from 2007-2012, HPD received 1,200 complaints per year about their officers; however, less than 7% of resulted in a 3 day or greater suspension of the officer. In the past 5 years, HPD officers are found at fault in collisions 40% of the time. That is a significant number for officers who are supposed to be upholding the law and be conducting themselves as an example to the community.

51.     In contrast, during that same time, HPD officers are disciplined less than 15% of the time with the majority of those disciplines coming in the form of a written reprimand which has no disciplinary impact on the officer. During this time, HPD officers were involved in 337 collisions that resulted in the death or serious injury of a civilian. Despite being at fault for 40% of those collisions, the majority of the officers were not disciplined. If an officer is disciplined, the discipline is usually only a suspension which further shows that officers are not worried about any repercussions for their actions under the City's policies, practices, and procedures.

52.     In 2020 alone, 12 people died in Houston from a high-speed police chase. Houston has just now announced that they are changing their high-speed chase policy due to these issues. Houston, however, has not attempted to address the numerous other issues including officer's complete disregard for traffic laws when not responding to an emergency. From 2018 through 2022, HPD officers engaged in 6,303 high-speed chases which was more than Dallas, San Antonio, and Austin combined which led to 27 deaths and 740 injuries.

53.     The Mayor of Houston in conjunction with the HPD and its policymakers recognized the danger of Houston's streets and the significant injuries and deaths occurring within this city. In 2020, Houston implemented the Vision Zero Plan in which they told the public of the dangers of Houston's streets and their design in conjunction with their speed limits. Specifically, streets like N. Shepherd Dr. were identified as an exceptional danger because they are straight roads, with lots of intersections, poor lighting, and numerous driveways. The goal was to eliminate vehicular deaths by 2030.

54.     Notably, the City recognized that one of the leading factors in collisions was speed. To combat this, the City proposed retraining the public's safe driving techniques and speed habits and better enforce speed limits. Ultimately, this plan was a "do as I say, not as I do" approach

because the City took no effort to retrain their own officers on safer driving techniques or to enforce proper speed of its officers while driving. In fact, the policies enacted after the Vision Zero Plan was put into place encourage reckless driving at unsafe speeds including the policy on filing charges within two hours of booking. Officer Cabrera confirmed these policies noting that officers do not pull each other over, that they are never disciplined for their speed, and that he was having to speed to fill out his report timely.

56.     Ultimately, Officer Cabrera's actions constitute a clear violation of Mr. Payne's constitutional right to be free from bodily injury. Additionally, the City is liable to Plaintiffs for their deliberately indifferent policies, practices, and procedures which were a moving force in the constitutional violation of Mr. Payne's rights. The City also maintained an inadequate training policy and procedure that was a moving force in causing the constitutional violation of Mr. Payne's rights, and the City was deliberately indifferent in adopting and implementing this training policy. Finally and in the alternative, the City is liable under the Texas Tort Claims Act for Plaintiffs' damages.

## V.    CAUSES OF ACTION

56.     Plaintiffs incorporate the foregoing paragraphs as if set forth fully herein.

### A.  COUNT I: *MONELL* CLAIM; VIOLATION OF THE FOURTEENTH AMENDMENT; PURSUANT TO 42 U.S.C. § 1983; OFFICIAL POLICY; AGAINST CITY OF HOUSTON.

57.     Plaintiffs bring a claim against the City of Houston for the violations of Mr. Payne's constitutional rights under the Fourteenth Amendment pursuant to *Monell* and its progeny. The City is liable to Plaintiffs because the City by and through its official policymakers promulgated and ratified policies and customs of which the policymakers had actual or constructive knowledge which were the moving force in the violation of Mr. Payne's constitutional rights. Officer

ORIGINAL COMPLAINT                                                                 19

Cabrera's actions which resulted in Mr. Payne's death were committed pursuant to one or more interrelated policies, practices, and customs identified below.

58.    Each of the policies identified below were promulgated by the policymakers and decisionmakers of the City of Houston and the Houston Police Department which includes the Houston Police Department Chief who is presently and at the time of the collision Chief Troy Finner. Chief Finner had actual and constructive knowledge of the policies as he either was aware of the patterns and practices within the city showing these policies or he himself implemented the policy.

59.    The policies as currently known and established through the facts and information identified above are as follows:

        a.    A policy of officers driving with reckless disregard to the lives and rights of civilians;

        b.    A two-hour charge policy which requires officers to drive recklessly and in significant excess of the speed limits without emergency equipment to meet HPD's requirements;

        c.    A policy of not disciplining or overseeing the driving of any HPD officer emboldening their reckless driving; and,

        d.    A policy permitting and encouraging officers to operate with complete disregard to traffic laws and the safety of civilians when the officer is merely assigned to a call regardless of whether or not the officer was actually responding to a call or emergency.

60.    The City's policies, practices, and customs singularly and taken together of

ORIGINAL COMPLAINT                                                                20

encouraging and promoting Officer Cabrera's reckless driving was the moving force behind Mr. Payne's death.

61.     Absent these policies, practices, and customs, Officer Cabrera would have acted in accordance with the traffic laws and would not have felt the need to speed to get back to the office in time to fill out a report. Absent his excessive speeding of going double the speed limit on a dangerous road, the collision would not have happened.

62.     It was highly predictable that an HPD officer such as Officer Cabrera who is never disciplined or monitored for his speeding would not fear receiving any punishment for doubling the speed limit. Further, it was predictable that an officer who must file a charge within two hours after booking a detainee, who must travel almost an hour away in traffic, and who must still fulfill other obligations of his job would drive at an excessive speed to meet this arbitrary deadline. It is also highly predictable that an officer would drive at an excessive speed while on a call if he is permitted to do so and if he is encouraged to do so without any threat of repercussion. The known and obvious consequence of these policies would be that civilians would be injured or killed by officers hitting them at excessive speeds.

63.     Each of these policies are shown above through the facts in this case and in light of the numerous incidents and statistics and the common-sense consequences of officers driving at double the speed limit without lights and sirens on a road that has a history of severe accidents with numerous opportunities for vehicles to pull out in front of the officer.

64.     Specifically, Officer Cabrera has testified that he was speeding back to the station to fill out a report because he had to meet the HPD policy to file the charge within two hours. He testified that because of the size of the city and the traffic it could take him up to an hour to get back to the station. Thus, he was driving 70 mph in a 35-mph zone which the City identified as a

high-danger area to try to coincide with this policy. The City was aware of its own size and the time it takes for its officers to get back to a station. Additionally, the City was aware that officers are not disciplined or monitored for their speed. Thus, the City was aware that Officer Cabrera would engage in this conscious-shocking deliberately indifferent driving in pursuant of this policy. Thus, this policy was a moving force in the constitutional violation of Mr. Payne's rights.

65.     Officer Cabrera's testimony illustrates that officers routinely drive significantly over the speed limit even when they are not on a call or responding to an emergency. The GPS data from Officer Cabrera's vehicle illustrates this by showing that throughout his trip that morning, Officer Cabrera routinely exceeded the speed limit by 20-plus mph. Officer Cabrera testified that officers never pull each other over and never receive any traffic violations for their actions. In fact, despite the fact that the City can monitor the officer's speed, the City never disciplines their officers for speeding.

66.     Because officers are never disciplined or monitored, officers routinely exceed the speed limit and flout traffic laws. Officer Cabrera on that day knew that he would not be pulled over or disciplined for driving double the speed limit. Thus, the City has a policy and custom of reckless driving by their officers as can be seen in the numerous incidents where officers were driving recklessly resulting in collisions and severe injuries to civilians. This policy is encouraged and corroborated by the additional policy of not disciplining or monitoring their officers' driving. Because Officer Cabrera was acting in accordance with the City policy and custom of reckless speeding and driving, this policy and custom was the moving force in Mr. Payne's death.

67.     Officer Cabrera also testified that he was assigned to a call at the time of the collision which permitted him to drive at double the speed limit. The undisputed evidence, however, establishes that Officer Cabrera was not **_responding_** to a call, there was no imminent

danger or threat to anyone, the call he was on was already handled by another officer who arrested the DUI suspect hours previously, and Officer Cabrera was simply heading to the station to fill out a report. Despite the lack of any need to get to the station quickly other than to fill out the charge in accordance with the City's policy, Officer Cabrera was driving in accordance with City policy of driving at reckless speeds for simply being assigned to a call. This exemplifies the City policy and custom of officer's driving at reckless speeds when they are assigned to a call regardless of whether any emergency exists. Because Officer Cabrera was driving 70 mph in a 35-mph zone on a known dangerous road in accordance with the City's policy, the City's policy and customs were a moving force in Mr. Payne's death and Plaintiffs' damages.

68.    In light of these constitutional violations, Plaintiffs suffered damages enumerated in the damage section below.

**B.  COUNT II: *MONELL* CLAIM; VIOLATION OF THE FOURTEENTH AMENDMENT; PURSUANT TO 42 U.S.C. § 1983; FAILURE TO TRAIN AND SUPERVISE; AGAINST CITY OF HOUSTON.**

69.    Plaintiffs incorporate the foregoing paragraphs as if set forth herein.

70.    Plaintiffs bring claims against the City for deliberate failure to train and/or supervise Officer Cabrera which resulted in the violation of Mr. Payne's constitutional rights.

71.    As shown above, the City and its policymakers, including Chief Finner, have been aware of the reckless driving by HPD officers who routinely engage in driving habits which place the lives of civilians at danger especially when those officers are not engaged in any active emergency response. Officers were never trained in proper safe driving techniques and safe driving speeds when not responding to active emergencies. Instead, officers are taught through their training and in their day-to-day functions within the police force that they are to react quickly and with reckless disregard to the safety of others by driving without lights and sirens and driving at

reckless speeds even when they are simply driving around. This training is solidified by the lack of discipline and oversight and by the implementation of additional policies which require officers to drive quickly to meet Department goals such as the two-hour charge policy.

72.    The City's training policy is inadequate as officers are not properly trained on the proper speed to drive while not responding to an emergency even if they are on a call or trying to comply with the Departments two-hour charge policy. This includes inadequate training on proper compliance with speed limits and to drive with due regard to the lives of those on the road in numerous circumstances.

73.    The need to train officers on the proper speeds to use when operating their police vehicle is obvious. Equally as obvious is the need to train officers on the timing of when they are permitted to disobey traffic laws and when they are not along with the need to operate with due regard to the lives of those on the road. The inevitable consequence of placing inadequately trained officers on the road who are encouraged and emboldened to drive with reckless disregard for traffic laws and to drive at excessive speeds whenever they seem fit is fatal collisions involving civilians. Police vehicles are heavier and more protected than regular vehicles which makes them deadlier when they collide with a civilian.

74.    Because the inevitable consequence of not training officers properly on maintaining safe speeds is the death of a civilian, the City maintained this policy with deliberate indifference to the known and obvious consequence. Each of the prior incidents and the testimony of Officer Cabrera illustrates that the City was aware that its officers were routinely endangering civilian's lives through their reckless driving. The numerous deaths and serious injuries of civilians due to officer's reckless driving in the past five years should more than demonstrate the need for further training to prevent these actions.

ORIGINAL COMPLAINT                                                                      24

75.     The City stated that they needed to retrain civilian driving habits in their Vision Zero Plan, yet they have ignored their own obvious need for additional training for their officers. As Officer Valdez's attorney stated in the criminal proceeding, his actions were in light of his not being trained on what speed he was to be traveling at the time of the collision.

76.     Here, Officer Cabrera was driving 70 mph in a 35-mph zone without any lights or sirens. Officer Cabrera had no purpose for driving this fast other than the fact that he was driving this fast in accordance with the City's policy. Officer Cabrera was trained under the City's deliberately indifferent training policy which he has confirmed as he has testified that he was permitted to drive this fast since officers do not get pulled over, he was trying to meet the two-hour charge policy, and because he was assigned to a call even though he was not responding to an emergency. If Officer Cabrera had been properly trained to place safety first, to drive in accordance with traffic laws at all times unless responding to specific emergencies, to be trained to drive at a reasonable speed, and trained not to exceed speed limits to simply meet an arbitrary two-hour charge deadline, Officer Cabrera would not have been speeding on that day and Mr. Payne would not have died. Therefore, the City's inadequate and deliberately indifferent training policy is the direct cause of Mr. Payne's death and Plaintiffs' damages.

## C. COUNT III: VIOLATION OF THE FOURTEENTH AMENDMENT; PURSUANT TO 42 U.S.C. § 1983; AGAINST CHRISTOPHER CABRERA.

77.     Plaintiffs incorporate the foregoing paragraphs as if fully stated herein.

78.     Plaintiffs and Mr. Payne are citizens of the United States.

79.     At all relevant times, Officer Cabrera was acting under color of state law as an officer of the City of Houston's Police Department. Officer Cabrera is a person under 42 U.S.C. § 1983.

80.     Mr. Payne had clearly established constitutional rights under the Fourteenth

ORIGINAL COMPLAINT                                                                 25

Amendment to bodily integrity and be free from injury and death by law enforcement officers who blatantly disregarded traffic laws and were not serving any legitimate government interest at the time of the collision.

81.     Any reasonable officer including Officer Cabrera knew or should have known of these rights at the time of the complained of conduct as they were clearly established at the time. Indeed it is clearly established that an officer who is speeding at an excessive speed (which going double the speed limit undoubtedly falls within this category) on surface streets without any emergency or legitimate need to go this speed constitutes a Fourteenth Amendment violation. In fact, Officer Cabrera going 70 mph on a 35-mph road that is known to be dangerous with numerous intersections, driveways, and crossings that has significant pedestrian foot traffic without lights or sirens is conscious shocking deliberate indifference to the lives of those on the road. Officer Cabrera knew or should have known that two people had previously died on that same section of road from traffic collisions.

82.     Officer Cabrera was simply returning to his station to fill out a report. Officer Cabrera had no legitimate government need to exceed the posted speed limit as no emergency was outstanding and he was not responding to any call. Additionally, Officer Cabrera had over an hour between leaving the JPC to the time of the collision in which he was routinely exceeding the speed limit by double digits. This is more than enough time for Officer Cabrera to have contemplated his actions and the potential consequences for those actions making his behavior even more arbitrary and conscious shocking. These actions were objectively unreasonable at all times.

83.     Officer Cabrera's actions while acting under color of state law and in abuse of his position violated Mr. Payne's constitutional rights causing Plaintiffs' damages.

ORIGINAL COMPLAINT                                                                           26

### D.  COUNT IV: TEXAS TORT CLAIMS ACT; AGAINST CITY OF HOUSTON.

84.    Alternatively, Plaintiffs bring a claim against the City of Houston under the Texas Tort Claims Act.

85.    At the time and on the occasion made the basis of this lawsuit, Mr. Payne, was acting as an ordinarily prudent person and exercising ordinary care under the circumstances. Nothing Mr. Payne did or failed to do caused the collision in question. In contradiction to such standard of care, Defendant City of Houston was guilty of negligence and/or negligence per se which was a proximate cause of the injuries and damages made the basis of this lawsuit. Defendant City of Houston, by and through its employee Officer Cabrera, owed a duty to Mr. Payne to operate the vehicle in a safe and reasonable manner. Officer Cabrera breached the duty as enumerated below, but not limited to:

     a.    Failure to keep a proper lookout;

     b.    Failure to use due caution;

     c.    Failure to control speed in violation of Tex. Transp. Code § 545.351;

     d.    Failure to brake properly;

     e.    Failure to take evasive action to avoid hitting Plaintiff;

     f.    Failure to control vehicle;

     g.    Driving recklessly in violation of Tex. Transp. Code § 545.401; and

     h.    Failure to use that degree of care as a person of ordinary, reasonable prudence would have used under similar circumstances.

86.    Each of these acts and omissions by Defendant City of Houston by and through its employee Officer Cabrera singularly or in combination with others, constituted negligence and/or negligence per se, which proximately caused the occurrence made the basis of this action and Plaintiff's damages. Officer Cabrera was simply returning to his station to fill out a report; thus,

ORIGINAL COMPLAINT                                                                27

he was not responding to any emergency and was not subject to a 9-1-1 call. Additionally, Officer Cabrera never responded at all that day to a 9-1-1 call or any other emergency.

87.     Defendant City of Houston is a governmental unit that employed Officer Cabrera. At the time of Plaintiff's injuries, Officer Cabrera was driving a vehicle owned by Defendant City of Houston within the course and scope of his employment for the City of Houston. Therefore, Plaintiff invokes the doctrine of *respondeat superior* as against Defendant City of Houston.

## VI.    <u>DAMAGES</u>

88.     Plaintiffs incorporate the foregoing paragraphs as if set forth fully herein.

89.     Plaintiffs seek compensatory damages, pre and post-judgment interest, costs, and attorney's fees to the maximum amounts allowed by law.

90.     As a direct and proximate result of the occurrence made the basis of this lawsuit, Plaintiffs were caused to suffer personal injuries and to incur the following damages:

a.      PLAINTIFFS' pecuniary loss sustained in the past;

b.      PLAINTIFFS' pecuniary loss that, in reasonable probability, PLAINTIFFS will have in the future;

c.      PLAINTIFFS' loss of companionship and society sustained in the past;

d.      PLAINTIFFS' loss of companionship and society that, in reasonable probability, PLAINTIFFS will sustain in the future;

e.      PLAINTIFFS' mental anguish sustained in the past;

f.      PLAINTIFFS' mental anguish that, in reasonable probability, PLAINTIFFS will sustain in the future;

g.      PLAINTIFFS' loss of inheritance;

h.      Physical pain and suffering sustained by Mr. Payne;

i.      Mental anguish sustained by Mr. Payne.

j.      Property damages;

k.      Towing fees;

l.      Loss of use;

m.      Court costs;

n.      Attorneys' fees; and

o.      Pre and post-judgment interest

## VII.    **ATTORNEY'S FEES**

91.      Plaintiffs incorporate the foregoing paragraphs as if set forth fully herein.

92.      Pursuant to 42 U.S.C. § 1988, Plaintiffs are entitled to recover their attorney's fees and costs. Therefore, Plaintiffs request a judgment to include an amount of attorney's fees which Plaintiffs have incurred to bring this action.

## VIII.    **JURY DEMAND**

93.      Plaintiffs respectfully request a trial by jury of their peers on all matters triable to a jury. Plaintiffs will tender the appropriate fee.

## IX.    **CONDITIONS PRECEDENT**

94.      All conditions precedent have been performed or have occurred as required by Tex. R. Civ. P. 54 and Tex. Civ. Prac. & Rem. Code § 101.001 *et seq.*

## X.    **PRAYER**

WHEREFORE, PREMISES CONSIDERED, Plaintiffs pray that Defendants City of Houston and Christopher Cabrera be cited to appear and answer herein and that upon a final hearing hereof, Plaintiffs be granted judgment against Defendants for their damages, pre-judgment and post-judgment interests, costs of suit, and attorney's fees in an amount within the jurisdictional

ORIGINAL COMPLAINT                                                    29

limits of this Court and for such other and further relief to which Plaintiffs may show themselves

justly entitled.

Respectfully submitted,

By:    **BEN CRUMP LAW, PLLC**

*/s/ Paul A. Grinke*
Paul A. Grinke – Lead Attorney
State Bar No. 24032255
Paul@bencrump.com
Aaron Dekle
State Bar No. 24100961
Aaron@bencrump.com
5 Cowboys Way, Suite 300
Frisco, Texas 75034
(972) 942-0494 Telephone
(800) 770-3444 Facsimile

**McCathern, PLLC**

Carl Evans
State Bar No. 24056989
cevans@mccathernlaw.com
Stephen M. Bergren
State Bar No. 24134428
sbergren@mccathernlaw.com
3710 Rawlins St., Suite 1600
Dallas, Texas 75219
(214) 741-2662 Office
(214) 741-4717 Facsimile

**ATTORNEYS FOR PLAINTIFFS**

ORIGINAL COMPLAINT                                    30